## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:21-cr-260-6-LMB |
| CARLOS JOSE TURCIOS VILLATORO, | |
| Defendant. | |

## MOTION FOR NEW TRIAL AND MOTION FOR JUDGMENT OF ACQUITTAL

The defendant, Carlos Turcios, files this motion for a new trial and for a judgment of acquittal, pursuant to Federal Rules of Criminal Procedure 29 and 33.

### 1. Introduction

Mr. Turcios raises three issues. First, as previously raised in a mistrial motion (ECF #688), a new trial should be granted, pursuant to Rule 33, because the Court denied Mr. Turcios his right to assistance of counsel, as well as his due process right to a fair trial, when it instructed the jury, among other things, to "completely disregard" Mr. Turcios's "entire closing argument" and not to consider "any of the information or arguments [counsel] offered." 1/30/24 Tr. 184:14-185:4. As the Supreme Court has held, "the trial court has no discretion to deny the accused [the] right [to make a closing argument]." *Herring v. New York*, 422 U.S. 853, 860 (1975) (omitting quotation and citation). The Fourth Circuit has also held that "[t]he right of a defendant to make a closing summary of the evidence is a basic element of the adversary factfinding process which applies in both jury and non-jury trials, and the denial of that right is not harmless error." *United States v. King*, 650 F.2d 534, 536 (4th Cir. 1981) (omitting quotation and citations).

Here, that error was compounded, because not only was Mr. Turcios denied his constitutionally guaranteed right to a closing argument, but the jury was instructed that it "may not use any of the information or arguments [Mr. Turcios's counsel] offered." By its own terms, that instruction conveyed to the jurors that not only must they ignore Mr. Turcios's closing argument, but they also could not rely on "any . . . information or arguments" contained therein, even if the information had been presented elsewhere at trial and even if the jury had considered arguments, or reached conclusions, of its own accord. In other words, it placed certain evidence and lines of arguments—favorable to Mr. Turcios—off-limits, and prevented the jury from considering his defense. Moreover, the drastic nature of the Court's instruction fundamentally and prejudicially discredited Mr. Turcios's counsel and his defense.

Second, as previously raised, a judgment of acquittal should be granted, pursuant to Rule 29, on the cocaine conspiracy count, because there was insufficient evidence of Mr. Turcios's involvement. Third, with regard to the 924(j) charges, Mr. Turcios joins his co-defendants' arguments regarding the lack of a *Rosemond* instruction.

## 2.  Statement of Facts

On July 14, 2023, Defendant Arevalo moved to sever on the basis of mutually-antagonistic defenses. ECF #349. On August 8, 2023, the Court denied that motion, ruling that defendant Arevalo could be tried with defendant Andrade, even when Arevalo's defense of the Tate murder was that he was not present, and Andrade's defense was that Arevalo was present, and in fact shot and killed the decedent, but justifiably, in self-defense. ECF #424.

After two continuances, six co-defendants were scheduled for a joint trial on January 2,

2

2024. On December 12, 2023, counsel filed a motion to allow the defendants to be seated in the well of the courtroom during trial, given the Court's stated plans otherwise. ECF #698. Two days later, in response, the Court issued an order ruling that "unless the parties present compelling objections," the trial will be severed into two trials of three defendants each, the first of which will begin on January 2, 2024, and the second of which will commence immediately upon its conclusion. ECF #713.

Subsequently, on December 20, 2023, the Court ruled that, despite the government's opposition, the Court would go forward with the severance, as previously ordered. Tr. 7:3-6. The Court ruled that such a severance was necessary to avoid a "due process violation" since it was "way too confusing a case," given the "complex Hispanic names" and the 20 counts in the charging document. Tr. 7:19-8:7.

The first trial group proceeded to trial on January 8, 2024. The second trial group— consisting of Menijvar, Arevalo, and Turcios—proceeded to trial on January 22, 2024. Each defendant had two attorneys. Consistent with the Court's pre-trial direction, the defendants in both trials proceeded, during arguments and examination of witnesses, in alphabetical order based on their paternal last names.

The government adduced testimony from three cooperating witnesses: Blue, Walter Rubio Lemus, and Karen Figueroa. Karen Figueroa, the wife of defendant Andrade, was a particularly important witness, as she was the only non-MS-13-member, non-law enforcement witness who testified for the government. During the first trial, she testified that she heard Blue, over speakerphone on a call to her husband, Andrade, say that he had committed the double

3

murder with Arevalo (with no mention of Mr. Turcios). 1/11/24 Tr. 84:6-85:18. In particular, she relayed that Blue said that Arevalo told the two murder victims he could get them drugs but that "they had to drive to get it from where he had it." So, Ms. Figueroa testified, Arevalo got the two victims in his car and drove them to pick up Blue. Arevalo and Blue then took the victims behind a convenience store and shot them. In particular, Blue said that Arevalo shot first. 1/11/24 Tr. 84:6-85:18. Arevalo's counsel, of course, was aware that this information inculpated Arevalo but exculpated Mr. Turcios. The government was aware. The Court was also on notice.

Consistent with Karen Figueroa's testimony in the first trial, in her opening statement during the second trial, Mr. Turcios's counsel told the jury that Figueroa was "going to come in and testify, that Blue told her that he committed the double murder with someone else, not Carlos." 1/22/24 Tr. 38:25-39:4. Moreover, amidst trial, in the days leading up to closing arguments, Mr. Turcios objected and filed written briefing, on two different occasions, in response to attempts by Arevalo to preclude the testimony of Karen Figueroa. *See* ECF #875 at 1 ("Mr. Turcios objects to any relief that precludes Karen Figueroa from testifying that Blue told her and her husband, [Andrade], that he committed the double murder with [Arevalo]. That statement, obviously, exculpates Mr. Turcios.") and ECF #878 (arguing that Karen Figueroa's testimony about the double murder was not inadmissible hearsay). Arevalo's attempts failed, and Karen Figueroa testified in the second trial, consistently with how she testified in the first trial. 1/26/24 Tr. 251:4-262:13; 1/29/24 Tr. 6:22-63:22.

Furthermore, Mr. Turcios called an alibi witness, Monse Ambriz, who provided an alibi for Mr. Turcios but not Arevalo. 1/29/24 Tr. 250-268. At the charge conference in advance of

4

closing arguments, Mr. Turcios specifically asked for an alibi instruction, on that basis. 1/30/24

Tr. 50:14-52:22.

Of course, defense counsel are not required to broadcast their defense to the government, co-defendants, or the Court. But, in this case, any attentive court-watcher could have put together Mr. Turcios's defense: that he was not at the double murder but instead was with his alibi witness, Monse Ambriz, and that Blue committed the murder with someone else—perhaps Tecolote, or maybe even another gang member (such as Arevalo, as Blue told Karen Figueroa).

Until the closing argument, the Court did not admonish or otherwise express any issues with Mr. Turcios's counsel, other than to stay at the lectern, which was an issue with multiple defense counsel and the government, due the positioning of the courtroom technology used for displaying exhibits. Closing arguments took place on January 30, 2024. The Court allowed, consistent with the first trial, government counsel 45 minutes for its closing and each defense counsel 30 minutes.

At various times throughout Arevalo's closing argument, his counsel expressed her personal opinion. For instance, her closing argument began: "I'm so glad to finally get the chance to actually speak to all of you and bring this wall down. There's so much that I want to say to you . . . ." Tr. 96:19-21.[1] Shortly thereafter, she continued, "I have a lot of thoughts about these homicides, but before I share them, I want to remind you that I don't have to prove anything to

---

[1] All of the closing arguments, and the issues that arose thereafter, occurred on January 30, 2024. Thus, for purposes of the transcript citations that follow, each refers to the transcript of the proceedings on that day.

you." Tr. 98:25-99:2. She continued, "I want to talk to you first about the [double] homicide . . . .
It wasn't [Arevalo] who killed those men. It looks to me like it was Blue and Tecolote." Tr. 99:7-
10.

Arevalo's counsel discussed the testimony of cooperators Blue and Walter Rubio Lemus.
For instance, she referred to cooperator Blue as someone "who has no moral compass
whatsoever," Tr. 97:2-3, and a "sophisticated, cunning, ruthless con man." Tr. 98-22-23. As for
Walter Rubio Lemus, counsel stated, "I'm actually glad Walter testified. You remember Walter,
his taca was Casquillo, he was a young guy, he was gentle . . . ." Tr. 98:4-6. At no point did
Arevalo's counsel mention Karen Figueroa, even though her testimony was damaging to Arevalo.

Counsel continued to express her personal opinions about the case. For example, counsel
stated, "Now, if [Arevalo] wasn't there, why would Blue blame him? And why would Blue put
him in the story? Those are good questions. Those are the questions I would have if I were you,
and of course you're asking them. That's your duty, and there are simple answers, and I view
them as being related." Tr. 103:1-6.

Counsel then discussed how, over the weekend, after hearing the testimony of Blue, she
had personally visited the scene where the double murder plot allegedly began, and, told the jury
how, based on her own observation of the scene, he was not telling the truth. Counsel said,
"[Blue's story] made so little sense that we went out over the weekend to test [Blue's story]. . . .
Mr. Becnel and I stood next to this dumpster." Tr. 107:18-21. She then described the experiment
that she helped conduct (wherein she sang the Star-Spangled Banner at the dumpster and was
not heard at the gas station) and said, based on her observations, "[Blue's story is] just not

possible. It's not possible. It's a story that Blue invented so he could find a way to include [Arevalo] in his crime." Tr. 108:1-3.

Mr. Turcios's closing argument followed. Tr. 136:9-150:16. At no point did Arevalo object. At no point did Menjivar object. At one point, government counsel objected, and the Court responded, "Don't object." Tr. 147:22-23.[2] Among other topics, counsel discussed the three cooperating witnesses called by the government to testify against the defendants. Here are the entire, unbroken words that were spoken:

> The government put on three cooperating witnesses. You remember these two? It's entirely up to you to evaluate people's testimonies to figure out who to trust based on what they say and how they say it and what their motivations may be.

> I suggest to you that not all of the government's cooperating witnesses are lying just because they're getting something in return. These two people, I suggest to you, they told the truth.

> How do we know that? Karen Figueroa. Her tears on cross-examination, that was real pain to me. She told you about that conversation when her husband got a call on speakerphone from Blue, and she overheard Blue tell her how he had just committed the double murder with [Arevalo]. Imagine your husband getting that call. That is a—that is a conversation that you remember. That's something that's seared in your memory. I suggest to you that she probably was telling the truth, and she probably got it right. And she said that she heard Blue say that they lured him behind the One Mart with drugs. There wasn't a conversation about the Exxon or about driving away and coming up with a plan.

> And then Walter Rubio Lemus. He had real regret to me. He didn't think that MS-13, being in it was glorious. He said it was the worst decision of his life. He said that he knew Carlos as Oculto, and that he had seen him around, like at a park or with the other guys, but he never heard that Carlos killed anyone. He never heard that Carlos sold any cocaine. There's been no evidence at all. At all.

---

[2] The Court interjected once, to tell counsel to speak from the lectern. Tr. 140:17-21 ("you've got to stay at the lectern").

And I challenge [the government] to stand up on rebuttal and tell you what evidence he has that Carlos sold cocaine, because he didn't. He smoked marijuana. He did not sell any cocaine. No one has told you that. So I think these two are telling the truth. I really do.

Blue is a different story. The shifty eyes. The no emotion. . . .

Tr. 137:12-138:21.

Counsel then continued on, providing reasons why Blue's account of the double murder was not credible. This was an important point, because the only witness who put Carlos at the double murder was Blue. As counsel told the jury, "[Blue] is the only person that you've heard from that has told you that Carlos had anything to do with the double murder, that he was there." Tr. 140:6-9. No lawyer—for the government or for either co-defendant—objected to any of these arguments.

In its rebuttal closing argument, the government disparaged the concept of reasonable doubt, saying, "Where that chart that she referred to as your North Star came from, I have no idea. That is something printed off from the Internet." Tr. 151: 8-10. The government was referring to a chart Mr. Turcios's counsel displayed, while discussing the concept of reasonable doubt, that illustrated the burden of proof in a criminal case. This chart is commonly used by defense attorneys in closing arguments, to contextualize the burden of proof beyond a reasonable doubt, and is attached hereto as Exhibit 2.

The government argued that Carlos was at the double murder and attacked Mr. Turcios's alibi witness: "He wasn't in the woods eating eggs based on the testimony of somebody who knows Jacquie's mom, is freaked out by clown makeup, and that's how she knew it was the day of

8

the murder, and she sent a screenshot, and nobody's seen it." Tr. 152:3-7.[3] The government

concluded by telling the jury, "You now know, despite all the illusions, despite all the

distractions, despite whatever you've been asked to look at over here while the murder reports

and discussions and promotions are going on over here, <u>you know the answer in your heart</u>." Tr.

159:12-16.

     a. <u>Arevalo's Untimely Motion for a Severance and/or Mistrial</u>

     Following closing arguments, the Court announced, "[w]e're going to start instructing

the jury." Tr. 159:23-160:1. Arevalo's counsel then asked for a severance, accusing Mr. Turcios's

counsel of being "deeply underhanded" by making "an effort to distinguish her client," and by

arguing, "for the first time," that Arevalo "was the real killer." Tr. 160:2-161:13. Mr. Turcios's

counsel attempted to speak, but the Court did not hear from her. Tr. 162:3-6. Instead, Arevalo's

counsel accused Mr. Turcios's counsel of a "last-minute back-handed maneuver" by "sa[ying]

Karen Figueroa told you the truth when she said that [Blue] did it with [Arevalo]," presenting

"an entire new theory of defense," and causing "a waste of resources [by] handl[ing] it this

way." Tr. 164:25-165:9. The Court noted, in response to Arevalo's contention that Arevalo's and

Mr. Turcios's defenses were "mutually antagonistic," Tr. 160:23-161:3, that "[i]t's the first

anybody, even the government or the Court, was put on notice that there would be this kind of

inconsistent defense." Tr. 162:21-23.

     Mr. Turcios's counsel said nothing and was not invited to speak. Instead, the Court asked

---

[3] Shortly thereafter, the Court interrupted government counsel to tell him not to stray from the lectern. Tr. 153:7-8.

Menjivar's counsel whether he thought the issue pertained to his client. Tr. 167:13-14.

Menjivar's counsel did not ask for a mistrial but noted that Mr. Turcios's counsel "did

reference, I believe Mr. Walter Lemus. And of course he is one of the witnesses that the

government used to establish our client's position in the gang." Tr. 168:1-3.[4]

    At this point, the Court, sua sponte, announced that it was striking the mandatory

minimum drug weight finding from the verdict form, because the government didn't address it in

its closing argument and thus had "abandoned" it. Tr. 168:14-170:4. The Court then recessed,

telling the government attorneys they "better talk to some of the senior people at [their] office"

to explore the "possibility" of "plea bargaining." Tr. 171:18-19. The Court stated that "unless

something is worked out," its "initial thinking" was to allow Mr. Turcios's case to go to the jury

and to declare a mistrial as to Arevalo and Menjivar. Tr. 171:9-12.

      b. <u>The Court strikes Mr. Turcios's entire closing argument and instructs the jury to
"completely disregard it" and that it "may not use any of the information or
arguments [counsel] offered"</u>

    A recess was taken, during which the government declined to offer plea deals to the

defendants. Back on the record, the Court announced that ultimately, instead of declaring a

mistrial, it had decided to instruct the jury to "completely disregard" the entire closing argument

for Mr. Turcios and that they "may not use any of the information or arguments she offered as

you deliberate in this case . . . ." Tr. 172:23-173:25. In full, Court said it intended to instruct the

---

[4] In his post-trial brief, counsel for Menjivar represents, without citation to the record, that he
"joined other counsel in asking for a mistrial," ECF #922 at 18, but the record belies that claim.
Menjivar's counsel never joined Arevalo's motion for a mistrial.

jury in the following manner:

> Now, during closing argument, the defendant, Carlos Jose Turcios Villatoro, that is Oculto, Ms. Van Pelt made improper and inappropriate statements regarding the credibility of witnesses in this case. Her closing argument improperly relied on her personal perception of the witnesses' credibility, which is called vouching, and is not permitted, and her argument did not focus solely on the evidence presented during trial. I am, therefore, instructing you to completely disregard the entire closing argument offered by Ms. Van Pelt on behalf of Mr. Turcios Villatoro. You may not use any of the information or arguments she offered as you deliberate in this case; however, nothing in this instruction changes the requirement that you cannot find Mr. Turcios Villatoro guilty of any offense unless the government has proven his guilt for that offense beyond a reasonable doubt.[5]

Tr. 184:14-185:4.

The Court stated that the reason for this instruction was that counsel for Mr. Turcios had "vouched." Tr. 172:23-24. Counsel for Mr. Turcios objected to this instruction as "obviously hugely prejudicial to [Mr. Turcios]." Tr. 175:1-3. Counsel asked if the Court would consider an instruction asking the jury to disregard only the offending remarks, as opposed to the entire closing argument. Tr. 175:4-6. The Court said no, explaining that "I thought it was way too emotional for federal court as well. It was an inappropriate closing argument almost from the beginning." Tr. 175:7-9. The Court then proceeded to instruct the jury as it had announced it would. After the instruction was read, Mr. Turcios renewed his objection and filed a motion for a mistrial.[6] Tr. 247:14-23. The jury returned a verdict convicting Mr. Turcios on all counts.

---

[5] This instruction is attached as Exhibit 1.
[6] ECF #888. The Court has not yet ruled on Mr. Turcios's motion for a mistrial. Mr. Turcios incorporates by reference the arguments he made therein.

3. **Argument**

Mr. Turcios advances three arguments, which are set forth below.

a.  <u>The Court's instruction to the jury to "completely disregard" Mr. Turcios's "entire closing argument," and that it "may not use any of the information or arguments [counsel] offered as you deliberate" deprived Mr. Turcios of his Constitutional rights to assistance of counsel and a fair trial</u>

Rule 33 provides that the Court may "grant a new trial if the interest of justice so requires."[7] As Supreme Court precedent and other case law makes clear, the Court should order a new trial, as its striking of Mr. Turcios's "entire closing argument," coupled with its instruction to the jury, denied Mr. Turcios the assistance of counsel, in violation of the Sixth Amendment. It also denied him the due process right to a fair trial, in violation of the Fifth Amendment.

i.  *The Supreme Court has recognized that the closing argument is the most important part of the trial*

"In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Herring v. New York*, 422 U.S. 853, 862 (1975); *see also* Michael Lyon, *Avoiding the Woodshed: The Third Circuit Examines Prosecutorial Misconduct in Closing Argument in United States v. Wood*, 53 Vill. L. Rev. 689, 689 (2008) ("In modern criminal cases, . . . the closing argument is often viewed as the most important part of the trial, providing the attorneys with their last opportunity to convince the jury of the defendant's guilt or

---

[7] Rule 33(a).

innocence."). Moreover, in the Fourth Circuit, "[c]losing argument, in particular, is a time for energy and spontaneity, not merely a time for recitation of uncontroverted facts." *United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009) (quoting *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1996)).

> ii.   *The Supreme Court has held that criminal defendants have a Constitutional right to a closing argument, and the trial court has "no discretion" to deny him such a right.*

The Supreme Court has held that denying a defendant the opportunity to make a closing argument, even in a bench trial, is a constitutional denial of the assistance of counsel. *Herring*, 422 U.S. 853. The Supreme Court recognized: "it has universally been held that counsel for the defense has a right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge." *Id.* at 858. "[A] total denial of the opportunity for final argument in a . . . criminal trial is a denial of the basic right of the accused to make his defense." *Id.* at 859. "[T]he trial court has no discretion to deny the accused [the] right [to make a closing argument]." *Id.* at 860 (omitting quotation and citation). As the Supreme Court explained, "[t]he widespread recognition of the right of the defense to make a closing summary of the evidence to the trier of the facts, whether judge or jury, finds solid support in history," going back to the 16th and 17th centuries. *Id.* at 860.

> iii.   *Case law makes clear that the Court cannot improperly restrict defense counsel's closing argument or discredit her and her arguments in front of the jury*

Short of disallowing or striking a defendant's closing argument, the Court cannot even improperly restrict it. As courts have recognized, such interference can undermine a defendant's

13

right to effective assistance of counsel or otherwise deprive the defendant of a fair trial by prejudicing the jury against the defendant. *See, e.g.*, *United States v. Hall*, 77 F.3d 398, 400 (11th Cir. 1996) (granting new trial where judge "limit[ed] [the defendant's] counsel too much as counsel delivered his closing argument, including on concept of reasonable doubt); *United States v. Tory*, 52 F.3d 207, 210 (9th Cir. 1995) (granting new trial where judge excluded legal argument, during closing, that was plausibly based on the evidence); *United States v. Gaines*, 690 F.2d 849, 858 (11th Cir. 1982) (the district court may be reversed if it denies the defendant "the opportunity to make all legally tenable arguments that are supported by the facts of the case").

Furthermore, the Court cannot prejudicially discredit an attorney, or her defense of her client, in front of the jury. "The law is well settled that the behavior and bearing of a judge during a jury trial must be such that the entire trial will be conducted in a general atmosphere of impartiality." *United States v. Cassiagnol*, 420 F.2d 868, 878 (4th Cir. 1970). "This is not to say that the judge cannot correct an erroneous statement made by a defendant's counsel or that the judge cannot instruct the jury to ignore an improper statement made by counsel, but it is incumbent on the judge to conduct himself impartially and without the obvious indication of . . . hostility toward counsel for either side." *Id.* at 879. *See, e.g.*, *United States v. Spears*, 558 F.2d 1296, 1298 (5th Cir. 1977) (reversing, for denial of fair trial, because "the court's castigation of counsel [during closing argument] so discredited him in the eyes of the jury that he could not have remained an effective advocate for his client"); *United States v. Cassiagnol*, 420 F.2d 868, 879 (4th Cir. 1970) (reversing where "interruption of defense counsel may have the effect of contaminating the jury's verdict by indicating the judge's evaluation of the weight of the

evidence and the merits of the defense").

Additionally, the Court must not allow an undue emphasis on speed to prejudice a defendant facing murder charges. *See, e.g.*, *Stockton v. State*, 544 So. 2d 1006 (Fla. 1989) (judge's 30-minute limitation on counsel's closing argument in a two-day murder case was unreasonably deprived the defendant of a fair trial; in this case, the Florida Supreme Court stated, "in a criminal case, considerable leeway must be given to defense counsel when arguing his or her case to the jury. A court should not unduly restrict defense counsel's argument . . . . Defense counsel . . . must be given sufficient time to fully and completely present his or her argument to the jury."); *Collier v. State*, 705 P.2d 1126 (Nev. 1985) (restricting counsel's argument to one hour in a capital murder case was an abuse of discretion).

> iv.  *The Court's instruction to the jury regarding Mr. Turcios's closing argument was Constitutional error*

The Court's instruction to the jury reads as follows:

> Now, during closing argument, the defendant, Carlos Jose Turcios Villatoro, that is Oculto, Ms. Van Pelt made improper and inappropriate statements regarding the credibility of witnesses in this case. Her closing argument improperly relied on her personal perception of the witnesses' credibility, which is called vouching, and is not permitted, and her argument did not focus solely on the evidence presented during trial. I am, therefore, instructing you to completely disregard the entire closing argument offered by Ms. Van Pelt on behalf of Mr. Turcios Villatoro. You may not use any of the information or arguments she offered as you deliberate in this case; however, nothing in this instruction changes the requirement that you cannot find Mr. Turcios Villatoro guilty of any offense unless the government has proven his guilt for that offense beyond a reasonable doubt.

Tr. 184:14-185:4.

This instruction deprived Mr. Turcios of his constitutional right to the assistance of

counsel, in violation of the Sixth Amendment, as set forth in *Herring*, 422 U.S. 853, as well as of his due process right to a fair trial. Moreover, for all intents and purposes, it directed the jury to find Mr. Turcios guilty. Without a contemporaneous objection to guide the jury, the Court broadly deemed counsel's arguments "improper" and "inappropriate." Not only did it instruct the jury to "completely disregard the entire closing argument offered by [counsel] on behalf of Mr. Turcios" (with no attempt to mete out the parts Arevalo found objectionable, after the fact), it instructed the jury that it "may not use any of the information or arguments she offered as you deliberate in this case." By the plain language of these words, the instruction directed the jury that it could use information presented at trial that was also discussed by counsel in closing argument. Moreover, it foreclosed the jury from considering arguments or conclusions offered by Mr. Turcios, even if the jurors themselves had independently considered those arguments or reached similar conclusions themselves as to the evidence. The Court's instruction de facto prevented the jury from viewing the facts in a light favorable to Mr. Turcios, thereby rubber-stamping the government's version of the facts, which the jury *was* permitted to consider, and directing verdicts of guilty. It also personally discredited Mr. Turcios's counsel, and her defense of her client, thereby contaminating the impartial atmosphere of the trial and further prejudicing the jury. In sum, across many fronts, the Court's instruction was serious error.

> v. *Clear Fourth Circuit precedent shows that Arevalo's argument for a severance/mistrial on the basis of alleged "mutually-antagonistic" defenses is meritless. It was not a proper basis for the Court's instruction.*

Arevalo's severance/mistrial argument is meritless, because the defenses are not so "mutually antagonistic" that Mr. Turcios's acquittal necessitated Arevalo's conviction, or vice

versa. The Fourth Circuit has considered a very similar multi-defendant case, in which a

defendant received a death penalty. *United States v. Lighty*, 616 F.3d 321, 349 (4th Cir. 2010).[8]

Two defendants were jointly tried: Flood and Lighty. *Id.* at 344. Flood's defense was that he did

not commit the murder; rather Lighty and another man (Wilson) did.[9] Lighty's defense was that

that he did not commit the murder, rather it "could just as easily" have been Flood and another

man (Mathis).[10]

The Fourth Circuit found that "Lighty's and Flood's defenses, while conflicting on

certain points, were not mutually antagonistic to the point where the jury was required to believe

the core of one defense and disbelieve the core of the other. . . . In other words, the jury was free

to disbelieve both Lighty's and Flood's versions of the events and conclude they both

participated in the Hayes kidnapping and murder. Such a conclusion did not rest on the belief of

one defendant's defense and the disbelief of the other defendant's defense." *Id.* at 349.

That Fourth Circuit decision controls the result here, and shows that Arevalo's belated

objection is without merit. Arevalo denied participating in the double murder but suggested Blue

---

[8] *See also United States v. Spitler*, 800 F.2d 1267, 1272 (4th Cir. 1986) (omitting internal quotation marks) (In order to sever on the ground of conflicting defenses, "it must be demonstrated that the conflict is so prejudicial that the differences are irreconcilable, and that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.").

[9] *Id.* at 349 ("Flood's defense at trial was that he did not participate in the Hayes kidnapping and murder. This defense was premised on the argument that there were only two individuals involved in the Hayes kidnapping and that Lighty and Wilson were those two individuals.").

[10] *Id.* at 349. ("Lighty's defense also centered on a denial of participation in the Hayes kidnapping and murder. In closing argument, . . . counsel argued to the jury that the 'two kidnappers could just as easily [have been] Mr. Flood and Mr. Mathis.'").

and Tecolote did it. Mr. Turcios also denied participating in the double murder and suggested that Blue and someone else—probably Tecolote but maybe Arevalo or another gang member—did it. As set forth in *Lighty*, these defenses are not "mutually antagonistic" to the degree to justify severance or a mistrial.

> vi. *Defense counsel is under no obligation to announce its defense to co-defendants and the Court and, in any event, it was obvious. Arevalo's counsel's personal attacks are unfair and do not provide a basis for the Court's instruction.*

A defense attorney's obligation is to her client. She has no obligation to, and is in fact specifically prohibited from, curtailing the presentation of exculpatory evidence, or declining to argue theories of innocence based on that evidence, merely because it may hurt a co-defendant's case. Indeed, each defendant has his own attorney (in this case, two attorneys) for precisely this reason. A defense attorney's obligation to her client should not, and cannot, be impaired by a co-defendant, or by co-defendant's counsel.

With limited exception, a defense attorney has no obligation to identify every nuance, or any nuance, of her client's defense. Indeed, a defendant has no burden of proof. A defendant is not required to adduce a single shred of evidence, through cross-examination of otherwise. His attorney could sit silently throughout trial and would still be able to—indeed, would be constitutionally entitled to—deliver a closing argument in which she invites the jury to draw conclusions, and consider theories of innocence, which may be inferred from the evidence. Moreover, defendants are permitted to adjust their defenses, based on the evidence adduced at trial, and to raise affirmative defenses, and even inconsistent defenses. *See, e.g.*, *Mathews v. United States*, 485 U.S. 58 (1988).

Regardless, Mr. Turcios's defense was broadcast throughout the trial, and Arevalo's after-the-fact outrage has no basis in the law. As set forth above, Karen Figueroa testified in the first trial that she heard Blue, over speakerphone on a call to her husband, Andrade, say that he had committed the double murder with Arevalo and recount how it had happened.[11] 1/11/24 Tr. 84:6-85:18. In her opening statement, Mr. Turcios's counsel told the jury that Karen Figueroa was "going to come in and testify, that Blue told her that he committed the double murder with someone else, not Carlos." 1/22/24 Tr. 38:25-39:4.

Moreover, in the days leading up to closing arguments, amidst trial, Mr. Turcios objected and filed written briefing, on two different occasions, in response to attempts by Arevalo to preclude the testimony of Karen Figueroa, which inculpated Arevalo and but exculpated Mr. Turcios. *See* ECF #875, #878. Furthermore, Mr. Turcios called an alibi witness, Monse Ambriz, who provided an alibi for Mr. Turcios but not Arevalo, and specifically asked for an alibi instruction. 1/29/24 Tr. 250-268; 1/30/24 Tr. 50:14-52:22. While defendants are not required to announce their defense, and shifts therein, to the government, co-defendants, or the Court, there was nothing surprising about Mr. Turcios's closing argument.

vii.   *Alleged "vouching" was not a proper basis for the Court's instruction*

The reason the Court gave for the instruction was "vouching." First, as the Court is

---

[11] In particular, Karen Figueroa testified that Arevalo told the two murder victims that he could get them drugs but that "they had to drive to get it from where he had it." So, Ms. Figueroa testified, Arevalo got the two victims in his car and drove them to pick up Blue. Arevalo and Blue then took the victims behind a convenience store and shot them. In particular, Blue said that Arevalo shot first. 1/11/24 Tr. 84:6-85:18.

aware, Arevalo failed to object at any point during Mr. Turcios's closing argument. Counsel is required to object, in real-time, to each specific instance of allegedly-objectional language in a closing argument. This requirement affords the Court an opportunity to address and/or correct any perceived issue and prevents the sandbagging that occurred here, where Mr. Turcios was allowed to give his entire closing argument, without objection, only to later have the Court, sua sponte, strike his entire closing argument as being "improper" and "inappropriate." Fundamental notions of fairness were violated.

Also, it strains logic. Because, on one hand, the Court's ruling indicates that the entire closing argument was so improper that it had to be struck; yet, on the other hand, it was not so improper as to draw an objection by Arevalo or Menjivar or the government, or contemporaneous admonishment by the Court (who, it should be noted, frequently interrupted counsel throughout the course of trial, to address various improprieties and other issues). As here, where no objection was lodged, the standard of review is plain error.[12] (Where an objection is made with regard to one comment at closing, but not another, the first is reviewed for harmless error and the latter for plain error. *United States v. Loayza*, 107 F.3d 257, 262 (4th Cir. 1997).)

Second, the Court should be wary in addressing alleged defense counsel "vouching," because in criminal cases courts are almost exclusively concerned with vouching by government. As the Fourth Circuit has stated, "The rule against vouching exists because the prosecution's

---

[12] Federal Rule of Criminal Procedure 52(b); *see United States v. Martinovich*, 810 F.3d 232, 238 (4th Cir. 2016) (where defense counsel failed to object during closing argument, any challenges are reviewed for plain error only).

opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *See United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009) (omitting internal quotations and citations) ("Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness.).

Third, a reading of the transcript of Mr. Turcios's closing argument—a document which was not available when the Court gave the instruction—does not support the Court's ruling. The Fourth Circuit has specifically declined to "hold that prosecutors must use more impersonal phrases such as 'I submit' or 'I contend' in lieu of 'I'm convinced' or 'I think.'" *United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009). Rather, the Fourth Circuit has "recognize[d] that great latitude is accorded counsel in presenting closing arguments to a jury. In our adversary system, prosecutors are permitted to try their cases with earnestness and vigor, and the jury is entrusted within reason to resolve heated clashes of competing views. *Id.* (omitting internal quotation marks and citations).[13]

In discussing the testimony of the government's cooperating witnesses, Mr. Turcios's counsel prefaced her remarks by reminding the jury that evaluating witnesses' credibility is

---

[13] *See also United States v. Huskey*, 90 F.4th 651, 672 (4th Cir. 2024) (finding, in an opinion released last month, no plain error when the prosecutor "thanked [defense] counsel for vouching for the credibility of a government witness by describing the witness as very believable and telling the truth and stated that the government agreed the witness was very believable." The prosecutor also "thanked [another defense] attorney for vouching for the truthfulness of a government witness by saluting the witness for coming here and telling his story and telling truth and stated that the Government would agree the witness came here and he told the truth.").

"entirely" up to them. Tr. 137:13-16 ("It's entirely up to you to evaluate people's testimonies to figure out who to trust based on what they say and how they say it and what their motivations may be.").

Moreover, Arevalo's counsel—despite her late-coming criticism of Mr. Turcios's counsel—injected her own personal opinion throughout her closing argument. For instance, she told the jury, "I have a lot of thoughts about these homicides, but before I share them, I want to remind you that I don't have to prove anything to you." Tr. 98:25-99:2. She continued, "I want to talk to you first about the [double] homicide . . . . It wasn't [Arevalo] who killed those men. It looks to me like it was Blue and Tecolote." Tr. 99:7-10.

Then, counsel discussed how, amidst trial, after hearing the testimony of Blue, she had personally visited the scene where the double murder plot allegedly began, and reached her own conclusions, which she then relayed to the jury. Counsel said, "[Blue's story] made so little sense that we went out over the weekend to test [Blue's story]. . . . Mr. Becnel and I stood next to this dumpster." Tr. 107:18-21. After singing the Star-Spangled Banner at the dumpster, and observing that it was not heard at the gas station, she declared to the jury, that based on her observations, "[Blue's story is] just not possible. It's not possible. It's a story that Blue invented so he could find a way to include [Arevalo] in his crime." Tr. 108:1-3.

Fourth, any alleged defense "vouching" was remedied by the Court's standard instructions to the jury. For instance, on five different occasions, the Court instructed the jurors that they were "the sole judges of the facts." 1/30/24 Tr. 183:3-4, 11-12; 186:12-14; 196:5-7; 236:22-23. Indeed, the Court told the jury: "Again, you'll hear this a million times in these

instructions, you are the sole judges of the evidence received in this case." 1/30/24 Tr. 186:12-14. More specifically, the Court told the jury a sixth time, "You as jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify, and only you determine the importance or weight, if any, that their testimony deserves." Tr. 190:11-14. Furthermore, the Court instructed the jury that "[S]tatements and arguments of counsel . . . are not evidence in the case . . . . You are to base your verdict only on the evidence received during the trial . . . ." 1/30/24 Tr. 183:24-184:3.

Courts have routinely held that these instructions remedy impermissible vouching by prosecutors. *See, e.g.*, *United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007). For instance, during his closing argument in *Brown*, "the prosecutor repeatedly stated that he 'believed' various Government witnesses." *Id.* at 1074. For instance, with respect to one, the prosecutor stated:

> I believe the evidence and testimony of Ms. Ana Alvarez Rios. I believe her testimony regarding this defendant and his actions proves him guilty beyond a reasonable doubt. And her testimony had a ring of truth or a ring of trustworthiness that you could take to the bank.

*Id.* As in the instant case, the defense attorney in *Brown* had not objected, and the Court found that the judge's instruction to the jury about jurors being "the sole judges of the facts" was sufficient to make it clear than the prosecutor's personal beliefs were irrelevant. *Id.* at 1076.

Fifth, alternatively, the Court could have simply given a neutral, non-prejudicial instruction on the matter. For instance, another judge in this Court gave the following instruction, of which the Fourth Circuit approved. It was an instruction that did not draw undue

attention to, or discredit, any particular counsel:

> Ladies and gentlemen, I caution you here at this point that during the course of closing argument both counsel perhaps from time to time used the phrase "I believe" or "I think," or this or that in referring to the evidence. That is not evidence. What counsel believes or thinks doesn't matter. It is what you believe and what you find to be the evidence. You are the judges of the facts. So I caution you of that.

*United States v. Loayza*, 107 F.3d 257, 262 (4th Cir. 1997).

Sixth, at worst, even assuming select of counsel's remarks constituted improper defense "vouching," and Arevalo's objection to which had not been waived, the Court could have stricken the offending remarks—a matter of less than a dozen words—as Mr. Turcios suggested, when the Court declared its intention to give the unconstitutional instruction.

> viii.  *The Court's opinion that counsel was "too emotional for federal court" is not a proper basis for the instruction*

The Court stated that it struck the entirely of Mr. Turcios's closing argument, instead of only the offending remarks, as suggested by counsel, because it was "too emotional for federal court." However, effective closing arguments require emotion. *See, e.g.*, Thomas A. Manuet and Stephen D. Easton, Trial Techniques and Trials (11th ed.), *Ch. 9: Closing Arguments* at p.435 ("To make effective closing arguments, trial lawyers . . . must repeat the themes and labels they have used throughout the trial to send compelling <u>emotional</u> messages.") (emphasis added). Indeed, counsel was arguing that her client was an innocent man being prosecuted for a murder he did not commit. That argument, delivered devoid of emotion, would be powerless.

Beyond that, there is a fraught history to identifying arguments made by women as "too emotional." Namely, "[w]omen's inability to properly control emotions is one of the most

salient and consistent stereotypes in the West." Frasca, T. J., Leskinen, E. A., & Warner, L. R. (2022). *Words Like Weapons: Labeling Women As Emotional During a Disagreement Negatively Affects the Perceived Legitimacy of Their Arguments*, PSYCHOLOGY OF WOMEN QUARTERLY, 46(4), 420-437, available at https://doi.org/10.1177/03616843221123745. Throughout modern history and continuing to this day, women are often labeled, unfairly and with prejudicial effect, as "too emotional."

Indeed, the government's rebuttal closing argument could also be deemed "emotional," and emotional in way that undermined the burden of proof. For instance, in referring to a commonly-used chart about the burden of proof beyond a reasonable doubt, the government stated: "Where that chart that she referred to as your North Star came from, I have no idea. That is something printed off from the Internet." Tr. 151: 8-10. The effect of that statement, which was inappropriate and served to personally discredit Mr. Turcios's counsel, was compounded by the Court's later instruction—in which the Court told the jury that what she did was "improper" and "inappropriate," and that it may not consider "any of the information" presented by her.

Moreover, government counsel concluded by telling the jury, "You now know, despite all the illusions, despite all the distractions, despite whatever you've been asked to look at over here while the murder reports and discussions and promotions are going on over here, you know the answer in your heart." Tr. 159:12-16. That is an emotional appeal.

      b.   The Court must enter a judgment of acquittal on the drug conspiracy

Rule 29 provides that the Court "must enter a judgment of acquittal of any offense for

which the evidence is insufficient to sustain a conviction."[14] The evidence at trial is insufficient to sustain Mr. Turcios's conviction on the conspiracy to distribute cocaine charge. The jury's guilty verdict on this count demonstrates the unfair prejudice induced by the Court's instruction regarding Mr. Turcios's closing argument.

> *i.  Procedural history*

Following the conclusion of the government's case, Mr. Turcios moved for a judgment of acquittal on the cocaine conspiracy count. 1/29/24 Tr. 243:11-19. In response, the government acknowledged that Demente, the second word of the clique, had said, "the only person I don't believe who sold the product is Oculto." 1/29/24 Tr. 243:21-25.

When asked by the Court what evidence had been adduced about Mr. Turcios "being involved in any drug sales," Mr. Blanchard stated that "there is evidence . . . that [Mr. Turcios] was associating with MS-13 for an extended period of time," and "we've had multiple witnesses talk about how many different clique members sold cocaine." 1/29/24 Tr. 244:3-5, 14-16.

The government then pointed to a Facebook conversation between Arevalo and his girlfriend (who was not a member or affiliate of MS-13), in which Arevalo wrote the following (translated from Spanish to English): "I had coke for Carlos and had sold it to him." 1/29/24 Tr. 163:15-20, 244:5-10. FBI Special Agent acknowledged that Demente was referred to by and went by Carlos. 1/29/24 Tr. 220:7-221:12. However, he testified that, based on his "review of the records," he understood Carlos in that message to refer to Oculto, or Mr. Turcios. 1/29/24 Tr.

---

[14] Rule 29(a), (c).

163:21-23. Finally, the government pointed to "the exhibits moved in from Mr. [Turcios'] phone in the 24 series, there are pictures of ledgers, notebook pages, amounts owed to different members, monikers on those notebook sheets." 1/29/24 Tr. 244:20-23.

The Court ruled that it would deny the motion at this point and take up the issue again after the jury returned with a verdict. 1/29/24 Tr. 245:9-11.

> ii.   *The standard for a judgment of acquittal*

The Court must uphold the verdict only if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence. *United States v. Kingrea*, 573 F.3d 186, 194 (4th Cir. 2009). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* at 194-195 (internal quotation omitted).

As the Fourth Circuit has recognized, "[s]ustaining a conviction [of conspiracy to distribute drugs] based on 'slight evidence' is contrary to the Government's obligation to prove crimes beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 861 (4th Cir. 1996).

> iii.   *What the government had to prove—beyond a reasonable doubt*

To prove Mr. Turcios guilty beyond a reasonable doubt, the government was required to show: (1) an agreement to distribute cocaine existed between two or more persons; (2) Mr. Turcios knew of the conspiracy; and (3) Mr. Turcios knowingly and voluntarily became part of this conspiracy. *See United States v. Hackley*, 662 F.3d 671, 678 (4th Cir. 2011). In other words, "[a] drug-distribution conspiracy . . . requires proof that [Mr. Turcios] knowingly agreed—either implicitly or explicitly—with someone else to distribute drugs." *United States v. Colon*, 549 F.3d

565, 569 (7th Cir. 2008).

"Mere association with conspirators is not enough to establish participation in a conspiracy." *United States v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999). "[G]uilt must remain personal and individual, and a conviction, especially on charges relating to a conspiracy, must rest on individual guilt proven beyond a reasonable doubt." *United States v. Samuels*, 741 F.2d 570, 575 (3d Cir. 1984) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)).

Indeed, for decades, jurists have expressed concern about the "elastic, sprawling" nature of the crime of conspiracy and "the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself[.]" *Krulewitch v. United States*, 336 U.S. 440, 447 (1949) (J. Jackson, concurring); *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940) (J. Hand). To sustain a conspiracy conviction, there must be "more than suspicion, more than knowledge, acquiescence, carelessness, indifference, [or] lack of concern." *Direct Sales v. United States*, 319 U.S. 703, 713 (1943). Indeed, "[o]ne may know of, and assist (even intentionally), a substantive crime without joining a conspiracy to commit the crime." *United States v. Townsend*, 924 F.2d 1385, 1393 (7th Cir. 1991).

### iv.   *The government's evidence is insufficient*

The government was required to adduce evidence to prove, beyond a reasonable doubt, that Mr. Turcios knowingly and voluntarily agreed to distribute drugs on behalf of the clique. It did not do so. The government did not introduce any controlled buys with Mr. Turcios or at which Mr. Turcios was present. No one testified that Carlos sold cocaine or was part of the cocaine conspiracy. The government's general assertion that this clique sold cocaine, and that

Mr. Turcios was a member of the clique, cannot constitute substantial evidence that Mr. Turcios knowingly and willfully agreed to the commission of a drug trafficking offense.

As the government acknowledged, Demente, the second word of the clique, stated that Mr. Turcios was the only one who didn't sell cocaine. The evidence suggests that the single message, between Arevalo and his girlfriend, which refers to "Carlos," was referring to Demente. However, even if one assumes it was referring to Mr. Turcios, there is no evidence that the cocaine allegedly sold to him was for distribution as part of the conspiracy, versus for his own personal or incidental use. Indeed, the phrasing of the message—"I had coke for Carlos and had sold it to him."—indicates that it was not given to him for distribution on behalf of the gang; rather, it was "sold" to him for his own personal use.

Finally, there were a couple photographs of notebook pages, recovered from Mr. Villatoro's phone, in which various gang members' tacas are listed, together with amounts. There is no reference to cocaine on these pages, and no testimony was offered to establish that the amounts pertained to cocaine. Indeed, the testimony established that members paid dues to the clique, separate and apart from any sale of cocaine.

Because the government failed to present sufficient evidence that Mr. Turcios conspired to distribute cocaine, the Court must enter a judgment of acquittal as to Mr. Turcios on that count.

     c.  <u>Mr. Turcios joins his co-defendants' arguments regarding the lack of a *Rosemond* instruction</u>

Mr. Turcios joins the arguments of co-defendants Arevalo and Menjivar with regard to

the denial of a *Rosemond*[15] instruction to guide deliberations on the 924(j) charges. The arguments presented in their motions apply with similar force to Mr. Turcios, who was also charged, and found guilty by the jury, of those offenses with regard to the double murder.

### 4. Conclusion

The Court must order a new trial on all counts except for the drug conspiracy, on which the Court should enter a judgment of acquittal. And Mr. Turcios should benefit on the *Rosemond* issue from whatever relief the Court affords his co-defendants.

Respectfully submitted,

/s/

Elizabeth L. Van Pelt
*Virginia Bar No. 82750*
*Delaware Bar No. 6117*
*District of Columbia Bar No. 1615865*
libbey@libbeyvanpeltlaw.com
LIBBEY VAN PELT LAW, PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
(571) 356-9066

*Counsel for Carlos Jose Turcios Villatoro*

Christopher Amolsch
*Virginia Bar No. 43800*
chrisamolsch@yahoo.com
12005 Sunrise Valley Drive
Suite 200
Reston, VA 20191
(703) 969-2214

---

[15] *Rosemond v. United States*, 572 U.S. 65 (2014).

30

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 23, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sends a notification of filing (NEF) to all counsel of record.

                                       /s/
                                    Elizabeth L. Van Pelt